## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| FREE SPEECH COALITION, INC.; DEEP CONNECTION TECHNOLOGIES, INC.; JFF PUBLICATIONS, LLC; BARRY CHASE, ESQ.; and PHE, INC., | ) ) ) ) ) ) |
|  | ) №. 4:24-cv-00514-MW-MAF |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ASHLEY MOODY, in her official capacity as THE ATTORNEY GENERAL OF THE STATE OF FLORIDA, | ) ) ) ) |
|  | ) |
| Defendant. | ) |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Rule 7-1,

Plaintiffs, move this Honorable Court for preliminary injunctive relief pending

resolution of the case on the merits.

## I.    INTRODUCTION

After numerous federal court decisions invalidating as unconstitutional state

and federal laws seeking to regulate or ban the publication of content harmful to

minors on the internet, the Florida Legislature has tried yet again with H.B. 3, §§

2 and 3, codified as Fla. Stat. §§ 501.1737 and 501.1738 (referred to herein as the "Verification Act" or "Act"). The Act places substantial burdens on Plaintiff website operators, content creators, and countless others who use the internet by requiring websites to age-verify every internet user before providing access to non-obscene material that meets the State's murky definition of "content harmful to minors."

This attempt to restrict access to online material is not novel. The United States Supreme Court invalidated a federal law restricting internet communications deemed harmful to minors on First Amendment grounds in *Reno v. ACLU*, 521 U.S. 844 (1997). It did so again in *Ashcroft v. ACLU*, 542 U.S. 656 (2004). And in state after state, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional. *See* Complaint ¶ 8 & n.1. Yet despite this long legacy of constitutional invalidity, the Florida Legislature has used not just the same tired justifications, but even the same statutory terms and definitions that led to invalidation of those past efforts. In doing so, it has placed Plaintiffs in the untenable position of abiding by the Act's terms and enduring the constitutional infringement, or violating the Act and risking lawsuits.

The Act violates the First Amendment in several respects. It imposes content-based restrictions on protected speech without the required narrow tailoring and without employing the least restrictive means to serve a compelling state interest, yet it captures a substantial quantity of protected speech without accomplishing the stated purpose of protecting minors from materials they may easily obtain from other sources and via other means. And because it is substantially overbroad and vague, it poses additional concerns under the First and Fourteenth Amendments. So, too, does it violate the Constitution's Supremacy Clause by treating certain website operators as "publishers"—just as federal law prohibits. *See* 47 U.S.C § 230 (hereafter, "Section 230").

Plaintiffs are a diverse mix of individuals and entities who, pursuant to 18 U.S.C. § 2201 and 2202, and 42 U.S.C. § 1983 and 1988, are seeking declaratory and injunctive relief to vindicate rights secured by the Constitution. To stave off irreparable injury from the (present and continuing) deprivation of these rights, they move herein for a preliminary injunction pending the final determination of their claims.

## II.    FACTUAL BACKGROUND

### 1.  The Act

H.B. 3, codified as Fla. Stat. §§ 501.1737 and 501.1738, imposes liability upon a "commercial entity that knowingly and intentionally publishes or

distributes material harmful to minors on the Internet on a website or application, if the website or application contains a substantial portion[1] of material harmful to minors [where the entity fails to] use either anonymous age verification or standard age verification to verify that the age of a person attempting to access the material is 18 years of age or older and prevent access to the material by a person younger than 18 years of age." § 501.1737 (2). Such commercial entities must provide both anonymous and standard age verification options (*id.*) and "must ensure that the requirements of s. 501.1738 are met." The section includes provisions restricting which third parties can provide anonymous age verification (§ 501.1738 (1)) and controlling how those third parties must protect and manage personal identifying information used to verify a user's age (§ 501.1738 (2)). Section 501.1737 (3) requires commercial entities to "ensure that the requirements of s. 501.1738 are met." § 501.1737 (3).

Any violation of §§ 501.1737 (2) or (3) "is deemed an unfair and deceptive trade practice" [subject to] "a civil penalty of up to $50,000 per violation and reasonable attorney fees and court costs" and in some cases unspecified "punitive damages." *Id*. at (4). In addition, "[a] commercial entity that violates subsection

---

[1] "'Substantial portion' means more than 33.3 percent of total materials on a website or application." § 501.1737(1)(j),

(2) for failing to prohibit access or prohibit a minor from future access to material harmful to minors after *a report of unauthorized or unlawful access* is liable to the minor for such access"—including damages of up to $10,000, and court costs and attorney fees. *Id.* at (5)(c) (emphasis added). The Act does not define what "a report of unauthorized or unlawful access" means, who may or must file such a report, or to whom such a report may or must be made.

A "commercial entity" includes every "legally recognized entity" from the largest "corporation" down to the smallest "sole proprietorship." § 501.1737 (2)(b). "[A]nonymous age verification" means a commercially reasonable method used by a government agency or a business for the purpose of age verification which is conducted by a nongovernmental, independent third party organized under the laws of a state of the United States," "[h]as its principal place of business in a state of the United States," and "[i]s not owned or controlled by a company formed in a foreign country, a government of a foreign country, or any other entity formed in a foreign country," (§ 501.1738 (1)) and "[s]tandard age verification" means any commercially reasonable method of age verification approved by the commercial entity. *Id.* (2)(i). However, what is "commercially reasonable" is not defined.

The Act's definition of "material harmful to minors" attempts to track the Supreme Court's modified-for-minors *Miller* Test[2] and includes material that: 1) the average person applying contemporary community standards would find, taken as a whole, appeals to the prurient interest; 2) depicts or describes, in a patently offensive way, sexual conduct as specifically defined in s. 847.001(19); and 3) when taken as a whole, lacks serious literary, artistic, political, or scientific value for minors. In turn, § 847.001(19) describes "sexual contact as: actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, or sadomasochistic abuse; actual or simulated lewd exhibition of the genitals; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed." Fla. Stat. § 847.001(19).

## 2. The Plaintiffs

Plaintiffs are a collection of non-profits, for-profits, and individuals who rely on the internet for communication, both as providers and recipients of First

---

[2] *See Ginsberg v. United States*, 390 U.S. 629, 639 (1968) (adapting general test of obscenity under the First Amendment to reflect "prevailing standards in the adult community as a whole with respect to what is suitable material for minors").

Amendment-protected materials.

**Free Speech Coalition, Inc. (FSC)** is a not-for-profit trade association representing hundreds of businesses and individuals involved in the production, distribution, sale, and presentation of constitutionally-protected and non-obscene materials that are disseminated to consenting adults via the internet. Most of that material would fit within Florida's statutory definition of "content harmful to minors." *See* Declaration of Alison Boden (hereinafter, "Boden Decl.").

**Deep Connection Technologies Inc. (DCT)** is the company that operates O.school, an online educational platform focused on sexual wellness. Because of the breadth and vagueness of the "content harmful to minors" definition, DCT is concerned that one-third or more of O.school content meets the statutory definition. As a provider of critical sex education appropriate (and necessary) for older minors, DCT opposes any age-verification measure that would preclude those teens from accessing O.school's content. *See* Declaration of Andrea Barrica (hereinafter, "Barrica Decl.").

**JFF Publications, LLC (JFF)** is the limited liability company that operates an internet-based platform at the domain <JustFor.Fans> that allows independent performers of erotic audiovisual works to publish their content and provide access to fans on a subscription basis. JFF is confused about what the Act requires and

concerned about the costs of compliance. *See* Declaration of Dominic Ford (hereinafter, "Ford Decl.").

**Barry Chase, Esq.** is a member of the Florida Bar who represents operators of adult entertainment and erotic websites, which requires his access to clients' (and others') websites that contain a substantial portion of material that may be deemed "harmful to minors" under the Act. Obtaining that access requires Chase to verify his identity upon each visit to an Act-compliant website, which is a hindrance to his ready admission, repugnant to his core values of privacy and freedom from government interference in protected expression, and the source of concern that his sensitive identity information may be subject to data leaks. See Declaration of Barry Chase (hereinafter "Chase Decl.").

**PHE, Inc. (PHE)** is a North Carolina Corporation doing business as Adam and Eve, a sexual wellness retailer that owns and operates various online stores and franchises brick and mortar stores bearing its trademark. Through its online store at adameve.com, PHE sells adult toys, games, and other erotic items, and through other websites, it sells adult videos, streams erotic movies, and promotes its brick-and-mortar franchise stores. These sites contain some material that might qualify as "content harmful to minors" under the Act, but PHE cannot determine which (if any) are out of compliance because it does not know, for example, what

constitutes "the material as a whole" or how it should measure the one-third threshold under which its "harmful to minors" offerings must remain vis-à-vis its other offerings. *See* Declaration of Chad Davis (hereinafter, "Davis Decl.").

### III.    LEGAL BACKGROUND AND HISTORY

For almost as long as the internet has been in American households, legislators at the state and federal levels have tried their hands at legislating disfavored content in a manner that would pass constitutional muster. They have roundly failed.

The first such attempt came via the federal Communications Decency Act (CDA) that criminalized, *inter alia,* the knowing dissemination of "obscene or indecent messages" to a recipient under 18 years of age and any message that "in context, depicts or describes, in terms measured by contemporary community standards, sexual or excretory activities or organs." *See* 47 U.S.C. § 223(a), (d). Shortly after the CDA took effect, groups of businesses, libraries, not-for-profit organizations, and educational societies brought a First Amendment challenge, which a three-judge panel in the Eastern District of Pennsylvania granted, enjoining the enforcement of the statute. *See ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996).

The government appealed directly to the Supreme Court, which unanimously invalidated the challenged provisions and affirmed the lower court's

injunction. *See Reno v. ACLU*, 521 U.S. 844 (1997). The Court first held that the provisions prohibiting transmission of "indecent" or "patently offensive" materials were blanket content-based restrictions on speech and not mere time, place, and manner regulations. As such, they would be strictly scrutinized. *See id.* So, too, were they facially overbroad—capturing much constitutionally protected material. *See id.*

After that invalidation, Congress returned to the drawing board to pass the Child Online Protection Acts (COPA), which prohibited any person from knowingly "making any communication [over the internet] for commercial purposes available to any minor and that includes any material that is harmful to minors." 47 U.S.C. § 231. Publishers could assert an affirmative defense to prosecution if they restricted minors' access in one of several ways: "(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number; (B) by accepting a digital certificate that verifies age; or (C) by any other reasonable measures that are feasible under available technology." *Id.* at § 231(c)(1). More limited than "indecent" or "patently offensive" messages, material "harmful to minors" was restricted to any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that:

*(A)  the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;*

*(B)  depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and*

*(C)  taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.*

47 U.S.C. § 231(e)(6).

Again, the statute was challenged by a diverse array of website operators offering everything from "resources on obstetrics, gynecology, and sexual health" to "books and images for sale." Sitting in review of the district court's grant of a preliminary injunction to the plaintiffs and the Third Circuit's affirmance of the same, the Supreme Court upheld the injunction. *See Ashcroft v. ACLU*, 542 U.S. 656 (2004). Specifically, it agreed that the least intrusive means of preventing minors from accessing erotic materials was through device-level technology, not site-level restrictions on speech:

*Filters are less restrictive than COPA. They impose selective restrictions on speech at the receiving end, not universal restrictions at the source. Under a filtering regime, adults without children may gain access to speech they have a right to see without having to identify themselves or provide credit card information. Even adults with children may obtain access to the same speech on the same terms by turning off the filter on their home computers. Above all,*

> promoting the use of filters does not condemn as criminal any
> category of speech, and so the potential chilling effect is eliminated,
> or at least much diminished. All of these things are true, regardless of
> how broadly or narrowly the definitions in COPA are construed.

*Id.* at 667. *See also id.* (noting that filtering software was more effective than COPA at keeping minors from harmful material online, per "findings of the Commission on Child Online Protection, a blue-ribbon Commission created by Congress in COPA itself").

Although Congress apparently lost its will to tinker with statutes aiming to restrict online content, some states then took up that mantle—albeit with the same record of failure.[3] This most recent effort from Florida reflects yet another wave of moral panic animating similar bills working their way through State Houses around the country. *See* FSC Action center, *Age Verification Bills and Laws*.[4] Courts have proved a bulwark against enforcement of those laws when

---

[3] *See, e.g., American Booksellers Foundation v. Sullivan*, 799 F. Supp. 2d 1078 (D. Alaska 2011) (Alaska); *American Booksellers Foundation v. Coakley*, 2010 WL 4273802 (D. Mass. 2010) (Mass.); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia); *American Booksellers Foundation v. Dean*, 342 F.3d 96 (2d Cir. 2003) (Vermont); *Cyberspace Communications, Inc. v. Engler*, 238 F.3d 420 (6th Cir. 2000) (Michigan); *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) (New Mexico); *Am. Civil Liberties Union v. Goddard*, 2004 WL 3770439, at *2 (D. Ariz. Apr. 23, 2004); *Southeast Booksellers v. Ass'n v. McMaster*, 282 F. Supp. 2d 389 (D.S.C. 2003) (South Carolina); *American Library Association v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) (New York).

[4] *Available at*: https://action.freespeechcoalition.com/age-verification-bills/all/.

challenged. *See Free Speech Coal., Inc. v. Skrmetti*, No. 2:24-CV-02933-SHL-TMP, 2024 WL 5248104 (W.D. Tenn. Dec. 30, 2024) (granting preliminary injunction); *Free Speech Coal., Inc. v. Rokita*, No. 1:24-CV-00980-RLY-MG, 2024 WL 3228197 (S.D. Ind. June 28, 2024) (granting preliminary injunction); *Free Speech Coal. v. Knudsen*, 2024 WL 4542260 (D. Mont. Oct. 22, 2024) (denying motion to dismiss); *Free Speech Coal. v. Colmenero*, 689 F. Supp. 3d 373 (W.D. Tex. 2023), *aff'd in part, vacated in part sub nom*, *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024) (granting preliminary injunction). The Supreme Court granted certiorari to review the only case that *didn't* impugn the constitutionality of a similar age verification law: *Paxton*, *supra*. The Supreme Court will hear that case on January 15, 2025.

The Act has done nothing to redress the many noted infirmities that led to the demise of COPA and injunctions against enforcement of similar efforts of state legislatures.

## IV.    ARGUMENT

### 1. Legal standards governing issuance of a preliminary injunction.

In the Eleventh Circuit, a court will consider four factors when deciding to grant or deny a preliminary injunction: (1) whether the moving party has a substantial likelihood of success on the merits; (2) the presence of irreparable injury unless the injunction is granted; (3) the balance of harm; and (4) the public

interest. *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). "A substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Id.* at 1271 n.12, quoting *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (emphasis in original). "This factor is 'generally the most important' of the four factors." *Id.*

Plaintiffs are entitled to a preliminary injunction in this case. They have a strong likelihood of success on the merits, as the Act restricts constitutionally protected content in a manner that is woefully ineffective, poorly tailored to the State's interest, overbroad, vague, and in conflict with supreme federal law. So, too, will Plaintiffs suffer irreparable injury absent the grant of an injunction, as they will face the untenable choice between (on one hand) ruinous civil liability and (on the other) statutory compliance at great expense and sacrifice of constitutional freedoms. Because the injunction will vindicate constitutional rights, its issuance will not invite harm upon others and doubtless will serve the public interest rather than frustrate it.

## 2. Plaintiffs are substantially likely to prevail on the merits.

The Act imposes clear violations of Plaintiffs' constitutional rights. Indeed, much of the Act's language is warmed over from previous efforts to restrict online content, which the Supreme Court, federal district and appellate courts, and state supreme courts all have roundly criticized.

### A. Facial Challenge

"In the First Amendment context, the overbreadth doctrine allows a party to challenge a law 'on its face because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" *Cheshire Bridge Holdings, LLC v. City of Atlanta,* 15 F.4th 1362, 1370 (11th Cir. 2021) (*quoting Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)). Although the party asserting a facial challenge to a statute typically must establish that "no set of circumstances exists under which [it] would be valid," *U.S. v. Salerno*, 481 U.S. 739, 745 (1987), "[i]n First Amendment facial challenges, the question is whether 'a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moms for Liberty v. Brevard Pub. Sch.,* 118 F.4th 1324, 1333 (11th Cir. 2024) (quoting *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024)); *see also New York State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) ("To succeed in its challenge, appellant must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally.").

### B. The Act is a content-based regulation of speech that cannot survive strict scrutiny, as the First Amendment demands it must.

i.  The Act cannot survive strict scrutiny

The Act imposes substantial burdens on content providers that want to publish constitutionally-protected materials on the internet. It precludes older minors from accessing important information about sex and sexuality at a time in their lives when they need it most. And it sweeps within its ambit a large swath of content published by pornographic and nonpornographic websites alike that adults have a First Amendment right to share and receive without state interference. *See Reno v. ACLU*, 521 U.S. 844, 874-75 (1997) (recognizing that "sexual expression which is indecent but not obscene is protected by the First Amendment" and that the government cannot pursue its interest in protecting minors through an "unnecessarily broad suppression of speech addressed to adults").

As a content-based restriction on protected, non-obscene speech, the Act is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (internal quotation marks omitted). To endure, the Act must survive strict scrutiny—meaning it must: (1) serve a compelling governmental interest, (2) be narrowly tailored to achieve that interest, and (3) be the least restrictive means of advancing that interest. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989).

Plaintiffs acknowledge that Florida has a compelling interest in protecting minors from exposure to harmful material on the internet. *See id.* ("[T]here is a compelling interest in protecting the physical and psychological well-being of minors[.]"). But the Act fails to withstand strict scrutiny because it is neither narrowly tailored to achieve the State's interest nor the least restrictive means of doing so. At state and federal levels, laws containing content-based restrictions on internet communications deemed harmful to minors have been held unconstitutional. *See infra* at 9-13. In enacting the Act, Florida has not learned its lessons from the past.

   ii. <u>The Act is not narrowly tailored to serve Florida's interest</u>

Most of the Act's definition of "material harmful to minors" was pulled verbatim from challenged sections of COPA that the district court for the Eastern District of Pennsylvania, Third Circuit, and Supreme Court declared unconstitutional. The Florida legislature did not so much as attempt to revise these definitions to save them from constitutional challenge, and there has been no intervening legal development to shield them today from the same arguments that carried the day two decades ago.

The Act is poorly tailored in at least the following respects:

*a. "As a whole"*

When legislating pursuant to the *Miller/Ginsberg* obscenity standard, it is "essential to answer the vexing question of what it means to evaluate Internet material 'as a whole,' when everything on the Web is connected to everything else." *ACLU v. Ashcroft*, 322 F.3d at 253. And although COPA did not define what, exactly, constituted the "whole" to be judged, the definition's reference to "any communication, picture, image file, article, recording, writing, or other matter of any kind" that satisfies the three prongs of the "harmful to minors" test led the Third Circuit to conclude that the statute "mandates evaluation of an exhibit on the Internet in isolation, rather than in context"—which "surely fails to meet the strictures of the First Amendment." *Id*. at 252–53 (noting that "one sexual image, which COPA may proscribe as harmful material, might not be deemed to appeal to the prurient interest of minors if it were to be viewed in the context of an entire collection of Renaissance artwork"); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ("[It is] an essential First Amendment rule [that] the artistic merit of a work does not depend on the presence of a single explicit scene.").

The Florida Act is virtually identical in relevant respects. Specifically, the Act defines as harmful to minors "any material" that meets the three-pronged, modified-for-minors *Miller/Ginsberg* test without clarifying the meaning of "as a

whole." *See* Fla. Stat. § 501.1737 (e). Just as COPA failed to satisfy the First Amendment by "mandat[ing] evaluation of an exhibit on the Internet in isolation, rather than in context," so does the Florida Act.

The Florida legislature had two decades to study the history and tinker with its definition to pass constitutional muster. Instead, it copied the language from COPA that the Court rejected in *Ashcroft*, leaving Plaintiffs and others scratching their heads.

b. *"Minor"*

The Supreme Court has strongly suggested that "modified for minors" obscenity regulations are unlikely to survive First Amendment scrutiny if they do not exempt older minors. *See Reno v. ACLU*, 521 U.S. 844, 865–66 (1997) (distinguishing the "junior obscenity" statute upheld in *Ginsberg* from the unconstitutional regulation before the Court on the basis that, among other things, the former exempted 17-year-olds, whereas the latter did not); *see also American Booksellers Foundation v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990) ("*Pope* [*v. Illinois*, 481 U.S. 497 (1987)] teaches that if any reasonable minor, including a seventeen-year-old, would find serious value, the material is not 'harmful to minors.'"). COPA defined "minor" as "any person under 17 years of age"— prompting the Third Circuit to quip that it "need not suggest how the statute's

targeted population could be more narrowly defined, because even the

Government does not argue, as it could not, that materials that have 'serious

literary, artistic, political or scientific value' for a sixteen-year-old would have the

same value for a minor who is three years old." *ACLU v. Ashcroft*, 322 F.3d at

253-54. The court concluded that "[e]ven if the statutory meaning of 'minor' were

limited to minors between the ages of thirteen and seventeen, Web publishers

would still face too much uncertitude as to the nature of material that COPA

proscribes." *Id*. at 255. For that reason alone, the statute was determined to be

unconstitutional. *See also ACLU v. Mukasey*, 534 F.3d at 193 ("Our prior decision

[in *ACLU v. Ashcroft*] is binding on these issues on this appeal.").

Rather than whittling down COPA's definition of "minor," the Florida

Legislature broadened it to include seventeen-year-olds—an age group more

developed in its sensibilities and more burdened by a blanket definition that

judges the "literary, artistic, political, or scientific value", not by reference to other

seventeen-year-olds, but to the broader (and younger) group of all "minors." The

result is the restriction of material appropriate (and in some cases, critical) to an

older teen's self-discovery in matters as elemental as sexual expression, sexual

orientation and gender identity. *See* Barrica Decl. ¶¶ 8-9. Again, the Florida

Legislature had more than two decades to adjust its definition to pass constitutional muster. Again, it failed to do so.

c. "Substantial portion"

Because the Act requires age-verification in order to access only those websites that offer "content harmful to minors" as a "substantial portion" of total content (defined as one-third or more), minors will face no impediment to obtaining such material from websites watered down—either incidentally or purposefully in order to avoid the statutory consequences—with other content unoffensive to the sensibilities of the Florida Legislature. Thus, given enough non-"harmful" material on a single site, even the providers of material that is "harmful to minors" under any definition will earn a pass under the Act. At the same time, the Act seeks to preclude minors from accessing even those websites offering mostly anodyne content when one-third of the site's material crosses the threshold into what might be construed as "harmful to minors."

Illogical results flowing from poorly conceived statutes usually occasion little constitutional concern, but the First Amendment demands greater precision. No content-based restriction on speech that would afford minors access to websites featuring hardcore pornography diluted sufficiently with Sesame Street videos, while denying access to websites (like O.school) offering a fulsome and

honest sexual education, can survive strict scrutiny. Even less so when the statutes

offer no guidance as to whether total content is determined according to bytes of

material, number of web pages, seconds of video, words of a sexual nature, or

some other metric entirely. See Davis Decl. ¶ 8; Ford Decl. ¶ 18.

### d. Chill on adult speech

The Supreme Court acknowledged that COPA's age-verification

requirement worked to chill adults from accessing protected speech. *Ashcroft v.*

*ACLU*, 542 U.S. at 667 (noting less restrictive alternative where "adults without

children may gain access to speech they have a right to see without having to

identify themselves or provide their credit card information"). *See also* Chase

Decl. ¶ 6. This chilling effect has led the Supreme Court time and time again to

disapprove of content-based restrictions that require recipients to identify

themselves before receiving access to disfavored speech.[5] *See, e.g.*, *Lamont v.*

*Postmaster General*, 381 U.S. 301 (1965) (holding that federal statute requiring

---

[5] Requiring internet users to present identification as a condition of access imposes a substantially greater intrusion than does a prove-your-age requirement of a patron at a movie theater, liquor store, or adult bookstore. Unlike digital age verification over the internet, those latter "real world" visits leave no record (or risk of one) and affect only those who are plausibly under-age. "Moreover, while an individual attending an event in-person has already given up some modicum of privacy to do so, an adult inside his home using his computer to access a website has not." *Free Speech Coal., Inc. v. Skrmetti*, 2024 WL 5248104, at *7, n.9.

Postmaster to halt delivery of communist propaganda unless affirmatively

requested by addressee violated First Amendment); *Denver Area Educ.*

*Telecomms. Consortium v. FCC*, 518 U.S. 727, 732–33 (1996) (holding

unconstitutional a federal law requiring cable operators to allow access to sexually

explicit programming only to those subscribers who request access to the

programming in advance and in writing).

Here, Florida failed even to provide meaningful guideposts for what age-

verification methods would prove "reasonable," thereby driving content producers

from the marketplace, including Plaintiff JFF. *See* Ford Decl. ¶¶ 12-13, 20, 22.

*e. Compelled speech*

Cautious operators of even non-pornographic websites must place an age-

verification content wall over their entire websites if they wish to continue

communicating with Florida audiences without risking tort liability or exposure

to government fines. Doing so necessarily labels them an adult business peddling

"content harmful to minors"—the consequences of which can be dire, including

not only declining internet traffic, but social stigma, lost ad revenue, and

exclusion from public or private programs or curricula. Websites that process

payments may lose the ability to accept major credit cards and be forced to use

third-party billing companies that charge fees up to 15% of the purchase price

(rather than the 3-5% typically charged by credit card companies). They also may face difficulty purchasing business liability insurance and hiring employees. *See* Ford Decl. ¶¶ 22-23.

By compelling speech based on the message of the speaker, the Act is, again, a content-based restriction subject to strict scrutiny. *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) ("There is certainly some difference between compelled speech and compelled silence, but in the context of protected speech, the difference is without constitutional significance, for the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). Requiring website operators to self-identify in such manner shifts the burden of deciphering an indecipherable statute from the State to the regulated operator, thereby capturing the cautious site operators while exempting the most brazen unless and until the AG decides to enforce or some private individual decides to sue. This is not the stuff of narrow tailoring, and by placing the onus on private parties to police compliance, the State has proven willing to tolerate a level of over- and under-inclusiveness that would be constitutionally problematic even if the Act was a paragon of clarity—which, of course, it isn't.

        iii.  <u>The Act is not the least restrictive means of serving Florida's interest</u>

When it comes to content-based restrictions on speech, it is well established that "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy*, 529 U.S. at 813; *see also Reno v. ACLU*, 521 U.S. at 874 ("Th[e] burden on adult speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose [of denying minors access to harmful content] that the statute was enacted to serve."); *Sable*, 492 U.S. at 126.

For decades now, courts have recognized the availability, affordability, and effectiveness of device-level blocking and filtering technologies that, as a parental option rather than a government mandate, pose no constitutional concerns. Faced with the argument that voluntary use of blocking and filtering software "places an onus on parents" who might not assume the mantle of responsibility, the Third Circuit was satisfied that the "Supreme Court has effectively answered this contention"—as a court must not assume "a plausible, less restrictive alternative would be ineffective; and a court should not presume parents, given full information, will fail to act." *ACLU v. Ashcroft*, 322 F.3d at 262 (quoting *Playboy*, 529 U.S. at 805).[6]

---

[6] The *Playboy* Court held unconstitutional a federal statutory provision that required cable operators who provide channels primarily dedicated to sexually-oriented programming to scramble or block those channels completely, or to "time channel"

Florida's legislatively-imposed site-level restriction casts the same wide net that decades ago was found both too wide and too porous to withstand constitutional scrutiny. Since then, that net hasn't shrunk, and the holes have grown only wider. The recent proliferation of cheap VPN programs has given children with a modicum of tech-savvy and access to Google the ability to scramble their IP address to evade a state's site-level restrictions. So, too, has accessing the dark web become simpler than ever before, and site-level content restrictions risk diverting children to corners of the hidden internet that are not so restricted, and which contain material far more harmful (and illegal) than what is available at an https. *See generally* Ahmed Ghappour, *Searching Places Unknown: Law Enforcement Jurisdiction on the Dark Web*, 69 Stan. L. Rev. 1075, 1087-90 (2017).

Meanwhile, in the years since COPA's constitutional challenge, device-level restrictions have improved dramatically. After a bench trial in the COPA litigation, the district court found that filtering technology can be calibrated to a particular child's age and sensitivity by the child's parents, and that filters, unlike

---

their transmission by limiting their availability to nighttime hours. The Court found this to be a "significant restriction of [protected] communication between speakers and willing adult listeners" that failed strict scrutiny because less restrictive means were available—an opt-out provision whereby a cable subscriber could request the cable company to scramble or block receipt of sexually explicit channels.

site-level age screening, are "difficult for children to circumvent." *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 789 (E.D. Pa. 2007), *aff'd sub nom.*, *ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). That technology has only improved in the intervening 15 years, as recent courts have found. *See*, *e.g.*, *Free Speech Coal. v. Colmenero*, 689 F. Supp. 3d at 403 ("[C]ontent filtering is likely to be more effective [than age verification] because it will place a more comprehensive ban on pornography compared to geography-based age restrictions, which can be circumvented through a virtual private network ("VPN") or a browser using Tor. Adult controls, by contrast, typically prevent VPNs (or Tor-capable browsers) from being installed on devices in the first place. And minors who wish to access pornography are more likely to know how to use Tor or VPNs."). So, too, has this technology proliferated. Today, many of these programs come preinstalled and ready to use from the moment a new computer or phone is purchased; others are free or inexpensive to download and highly customizable, offering benefits well beyond screening for sexual content. *See* Boden Decl. ¶¶ 11-15.

Florida of course could have created incentives and campaigned for the improvement and expanded use of content filters—as the Supreme Court has suggested. *See Ashcroft v. ACLU*, 542 U.S. at 670 ("Congress can give strong incentives to schools and libraries to use [device filters]. It could also take steps to

promote their development by industry, and their use by parents. . . . By enacting

programs to promote use of filtering software, Congress could give parents that

ability without subjecting protected speech to severe penalties."). It hasn't done

so—opting instead for a blanket restriction that, by imposing substantial costs on

content providers, reveals the State's true intention of stifling disfavored speech.

*See* Ford Decl. ¶¶ 12-13; Barrica Decl. ¶ 10. *See also ACLU v. Mukasey*, 534 F.3d

at 195 (suggesting that weaknesses of site-level restrictions, compared against

device-level filters, "might raise the inference that Congress had some ulterior,

impermissible motive for passing COPA").

"Precision of regulation must be the touchstone in an area so closely

touching our most precious freedoms." *Elrod v. Burns*, 427 U.S. 347, 363 (1976).

Here, that precision is woefully lacking, leaving Defendant with no serious

argument that the Act may survive strict scrutiny.

## C. The Act is both constitutionally overbroad and vague.

A statute that burdens otherwise protected speech is facially invalid when

that burden is not only real, but "substantial as well, judged in relation to the

statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615

(1973). Put another way, the overbreadth doctrine prohibits the Government from

restricting even unprotected speech where "a substantial amount of protected

speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535

U.S. at 237. An overbreadth analysis often engages in the same questions as the narrow tailoring prong of a strict scrutiny analysis. *See ACLU v. Ashcroft*, 322 F.3d at 266 ("Overbreadth analysis—like the question whether a statute is narrowly tailored to serve a compelling governmental interest—examines whether a statute encroaches upon speech in a constitutionally overinclusive manner.").

So, too, may overbreadth challenges overlap substantially with Fourteenth Amendment void-for-vagueness challenges. *See Kolender v. La*wson, 461 U.S. 352, 358 n. 8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."). A statute is void for vagueness if it "forbids . . . the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). "[S]tandards of permissible statutory vagueness are strict in the area of free expression," and the "Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar." *NAACP v. Button*, 371 U.S. 415, 432 (1963); *see also Reno v. ACLU*, 521 U.S. at 871–72 (1997) (where the vagueness arises amidst a "content-based regulation of

speech[,] the vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech").

The Act is both substantially overbroad and unconstitutionally vague in myriad respects. As discussed *supra*, the phrase "taken as a whole" in the definition of "content harmful to minors" does not explain how the "whole" is to be judged. Should one consider only a specific article, certain text, or an individual image on a website? Or should one consider the web page on which that text or image appears? Or the entire website? And should one include linked or embedded material? The phrase "substantial portion," defined as one-third or more of the "total amount of data available on a website," likewise fails to explain how this "total amount of data" is calculated. What is the proper metric to measure? Gigabytes? Character or pixel count? Number of images? Video runtime? And what about linked material? May a website avoid the problem altogether by providing a link to all the innocuous content in the local public library? These ambiguities have led to confusion among the Plaintiffs and fear of liability for noncompliance with the Act. *See* Davis Decl. ¶¶ 6-9; Ford Decl. ¶¶ 14-21.

The term "minor," defined as "a person under eighteen (18) years of age," is similarly vague in its connotation insofar as it fails to designate the whole from

which a content provider must ascertain the average. Whether material lacks

serious literary, artistic, political, or scientific value is determined "with respect to

minors." But does this "minor" refer to some generic pre-teen reflecting the

median sensibility across all minors, from infants to high school seniors? Or some

other person occupying some other position on a composite maturity spectrum?

To the extent that older minors are shut out from accessing critical, age-

appropriate content, the definition is substantially overbroad (and potentially

dangerous). *See* Barrica Decl. ¶¶ 8-9.

The term "website" is also overbroad and vague to the extent that it might

capture just about anything on the internet—from a performer's channel hosted on

another platform, to the skeleton of that platform, to the entire contents of that

platform and even other platforms housed on the same servers and sharing the

same code. *See* Ford Decl. ¶¶ 16-17; Davis Decl. ¶ 7.

The definitions for the two kinds of age verification depend on an

intrinsically vague tautology: "any commercially reasonable method of age

verification" [501.1737(1)(i)] and "a commercially reasonable method used by a

government agency or a business for the purpose of age verification"

[§501.1738(1)]. There are no guideposts whatsoever as to what "commercially

reasonable" demands. *See* Ford Decl. ¶ 19; Barrica Decl. ¶ 10, Davis Decl. ¶ 9.

Reference to "contemporary community standards" is vague and overbroad due to the borderless nature of the internet. Florida is a diverse state, and the "contemporary community standards" vary widely from Pensacola to Miami Beach, but when a content provider publishes material on a website, the same material is made available in every Florida county. To avoid running afoul of the Act, websites must abide by a "most prudish community" standard—restricting (in the case of minors) or chilling (in the case of adults) substantial quantities of constitutionally protected content.

Finally, it is unclear what mens rea the Act imparts. Must the site operator merely intend to publish or distribute material that, incidentally, happens to fit the statutory definition of "content harmful to minors?" Must it know that the published material meets that definition? Must it know that the publishing website's offerings, as a whole, comprise at least one-third such material?

By placing significant burdens on web publishers' ability to disseminate protected speech and web users' ability to receive it, the Act encroaches upon a significant amount of protected speech beyond that which Florida may target constitutionally to prevent minors' access to sexual material. *See Ginsberg*, 390 U.S. at 639–43; *Sable*, 492 U.S. at 126; *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212–14 (1975). And by phrasing so much of the operative language in

terms that even a trained attorney (never mind an average person) is unable to understand, the Act is unconstitutionally vague, as well. *See Connally*, 269 U.S. at 391; *Reno v. ACLU*, 521 U.S. at 871–72.

**D. The Act violates the Supremacy Clause.**

The Act violates the Constitution's Supremacy Clause because it stands in direct conflict with federal law.

Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C § 230(c)(1). Plaintiff JFF is a "provider or user of an interactive computer service" within the intendment of the statute. *See* 47 U.S.C § 230(f)(2) (defining "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."). JFF does not produce material that could plausibly be deemed "content harmful to minors." Rather, it merely provides the platform for other "information content providers." *See* 47 U.S.C § 230(f)(3) (defining term to mean "any person or entity that is responsible, in whole or in part, for the creation or development of

information provided through the Internet or any other interactive computer service").

In seeking to render JFF and other providers and users of "interactive computer services" liable on account of the actions of "content providers," the Act stands in direct conflict with Section 230, which expressly preempts inconsistent state laws. *See* 47 U.S.C § 230(e)(3). Article VI, Paragraph 2 of the U.S. Constitution requires that federal law take precedence in such case. *See Dowbenko v. Google Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (per curiam) (affirming dismissal of state law defamation claim because "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.").

### 3. Irreparable harm

It is axiomatic that "the loss of First Amendment freedoms, for even minimal periods of time, un-questionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) ("[V]iolations of First Amendment rights constitute per se irreparable injury."). This is because "chilled free speech" cannot "be compensated for by monetary damages; in other words, plaintiffs could not be made whole." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (*citing Ne.*

*Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990)).

### 4. The balance of equities and consideration of the public interest favor granting an injunction.

"Where the government is the opposing party, balancing of the harm and the public interest merge." *Gayle v. Meade*, 614 F. Supp. 3d 1175, 1206 (S.D. Fla. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). The public interest is always served where First Amendment rights are upheld. *See*, *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) ([E]njoining the ordinances, if they were found to be in violation of the First Amendment, would advance the public's interest in freedom of speech.").

### V.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to enjoin Defendant Moody from enforcing the Act pending the final determination of this action.

### VI.    REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiffs respectfully request oral argument on this Motion and estimate that one (1) hour would be required for the hearing.

*Respectfully Submitted,*

Dated: January 6, 2025

 /s/ Gary S. Edinger                          
Gary S. Edinger, Esquire
Florida Bar № 0606812
Benjamin, Aaronson, Edinger
    & Patanzo, P.A.
305 N.E. 1st Street
Gainesville, FL  32601
Phone: (352) 338-4440 / Fax: 337-0696
GSEdinger12@gmail.com

 /s/ Lawrence G. Walters                  
Lawrence G. Walters
Florida Bar № 0776599
Walters Law Group
195 W Pine Ave.
Longwood, FL  32750
Phone: (407) 975-9150
larry@firstamendment.com


Jeffrey Sandman
Louisiana Bar № 39073
Webb Daniel Friedlander LLP
5208 Magazine St., Ste 364
New Orleans, LA  70115
Phone: (978) 886-0639
jeff.sandman@webbdaniel.law*

D. Gill Sperlein
California Bar № 172887
The Law Office of D. Gill Sperlein
345 Grove Street
San Francisco, CA  94102
Phone: (415) 404-6615
gill@sperleinlaw.com*

\* *Pro hac vice* pending

\* *Pro hac vice* pending

*Attorneys for Plaintiffs*


## CERTIFICATE OF GOOD FAITH CONFERENCE

Undersigned counsel certifies that Plaintiffs' attorneys conferred with

counsel for the Defendant concerning a voluntary stay on enforcement of the

challenged Act in conjunction with the Defendant's requested stay of these

proceedings. The Defendant declined to agree to a voluntary stay and opposes the

relief sought by this motion.

  /s/ Gary S. Edinger

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), undersigned counsel certifies that this

motion and memorandum contains 7,681 words, as determined by the word-

processing system used to prepare the memorandum.

  /s/ Gary S. Edinger

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion

has been forwarded to NATHAN A. FORRESTER, Esquire [nathan.forrester

@myfloridalegal.com], KEVIN GOLEMBIEWSKI, Esquire [kevin.golembiewski

@myfloridalegal.com], BRIDGET K. O'HICKEY, Esquire [Bridget.ohickey@

myfloridalegal.com]; WILLIAM H. STAFFORD III, Esquire [William.Stafford

@myfloridalegal.com]; and KEVIN A GOLEMBIEWSKI, Esquire, [kevin.

golembiewski@myfloridalegal.com], The Capitol, PL-01 Tallahassee, FL 32399,

via the CM/ECF System this 6th day of January, 2025.

  /s/  Gary S. Edinger